# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| ANGIE LEE LOFFLAND OCHOLA,      ) | |
|      ) | |
| Plaintiff,      ) | |
|      ) | **CIVIL ACTION** |
| v.      ) | |
|      ) | **No. 16-1316-JWL** |
| NANCY A. BERRYHILL,[1]      ) | |
| **Acting Commissioner of Social Security,**      ) | |
|      ) | |
| Defendant.      ) | |
| _____ ) | |

## MEMORANDUM AND ORDER

Plaintiff seeks review of a decision of the Acting Commissioner of Social Security (hereinafter Commissioner) denying Disability Insurance benefits (DIB) under sections 216(i) and 223 of the Social Security Act. 42 U.S.C. §§ 416(i) and 423 (hereinafter the Act). Finding no error in the Administrative Law Judge's (ALJ) decision, the court ORDERS that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the Commissioner's final decision.

## I.      Background

---

[1]On Jan. 20, 2017, Nancy A. Berryhill became Acting Commissioner of Social Security. In accordance with Rule 25(d)(1) of the Federal Rules of Civil Procedure, Nancy A. Berryhill is substituted for Acting Commissioner Carolyn W. Colvin as the defendant. In accordance with the last sentence of 42 U.S.C. § 405(g), no further action is necessary.

Plaintiff applied for DIB, alleging disability beginning January 27, 2012. (R. 19, 160). Plaintiff exhausted proceedings before the Commissioner, and now seeks judicial review of the final decision denying benefits. She argues that the Administrative Law Judge (ALJ) erred in assessing her residual functional capacity (RFC) by improperly relying on the opinions of a treating physician and of a non-examining physician, by imposing his own medical opinion, by evaluating obesity improperly, and by improperly determining the credibility of Plaintiff's allegations of symptoms. She argues that the appropriate remedy for these errors is remand for payment of benefits.

The court's review is guided by the Act. Wall v. Astrue, 561 F.3d 1048, 1052 (10th Cir. 2009). The Act provides that in judicial review "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The court must determine whether the ALJ's factual findings are supported by substantial evidence and whether he applied the correct legal standard. Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007); accord, White v. Barnhart, 287 F.3d 903, 905 (10th Cir. 2001). Substantial evidence is more than a scintilla, but it is less than a preponderance; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971); see also, Wall, 561 F.3d at 1052; Gossett v. Bowen, 862 F.2d 802, 804 (10th Cir. 1988).

The court may "neither reweigh the evidence nor substitute [its] judgment for that of the agency." Bowman v. Astrue, 511 F.3d 1270, 1272 (10th Cir. 2008) (quoting Casias v. Sec'y of Health & Human Servs., 933 F.2d 799, 800 (10th Cir. 1991)); accord,

Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005). Nonetheless, the determination whether substantial evidence supports the Commissioner's decision is not simply a quantitative exercise, for evidence is not substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion. Gossett, 862 F.2d at 804-05; Ray v. Bowen, 865 F.2d 222, 224 (10th Cir. 1989).

The Commissioner uses the familiar five-step sequential process to evaluate a claim for disability. 20 C.F.R. § 404.1520; Wilson v. Astrue, 602 F.3d 1136, 1139 (10th Cir. 2010) (citing Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988)). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084). In the first three steps, the Commissioner determines whether claimant has engaged in substantial gainful activity since the alleged onset, whether she has a severe impairment(s), and whether the severity of her impairment(s) meets or equals the severity of any impairment in the Listing of Impairments (20 C.F.R., Pt. 404, Subpt. P, App. 1). Williams, 844 F.2d at 750-51. After evaluating step three, the Commissioner assesses claimant's RFC. 20 C.F.R. § 404.1520(e). This assessment is used at both step four and step five of the sequential evaluation process. Id.

The Commissioner next evaluates steps four and five of the sequential process-- determining at step four whether, in light of the RFC assessed, claimant can perform her past relevant work; and at step five whether, when also considering the vocational factors of age, education, and work experience, claimant is able to perform other work in the

economy.  Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084).  In steps one

through four the burden is on Plaintiff to prove a disability that prevents performance of

past relevant work.  Blea v. Barnhart, 466 F.3d 903, 907 (10th Cir. 2006); accord,

Dikeman v. Halter, 245 F.3d 1182, 1184 (10th Cir. 2001); Williams, 844 F.2d at 751 n.2.

At step five, the burden shifts to the Commissioner to show that there are jobs in the

economy which are within the RFC assessed.  Id.; Haddock v. Apfel, 196 F.3d 1084,

1088 (10th Cir. 1999).

The court addresses Plaintiff's arguments in the order presented in her Brief, and

finds no error in the ALJ's decision.

## II.    The Medical Opinions of Dr. Dobyns and Dr. Klinger

Plaintiff claims that the ALJ erred in relying on the stale opinions of Dr. Dobyns

who treated Plaintiff for a period of time in 2011 and of Dr. Klinger, the state agency

physician who reviewed the record and provided her opinion on March 29, 2013 at the

reconsideration level.  She argues the opinions are stale because they were formulated

before Plaintiff's condition worsened–as is demonstrated by Plaintiff's testimony, an MRI

dated August 2, 2013, and a study dated February 24, 2014–and because Dr. Dobyns's

opinion and the MRI upon which it was based were dated before Plaintiff's alleged onset

date of disability.  She argues that the ALJ did not recognize the worsened condition, did

not discuss the 2013 MRI, and mischaracterized the February 2014 study.

The Commissioner argues that the ALJ is entitled to rely on the opinions even

though they were formulated early in the administrative process because an RFC

assessment is based on all of the record evidence.  (Comm'r Br. 16-17).  She argues that

Dr. Dobyns released Plaintiff to return to work in September 2011, only shortly before

her alleged onset date in January 2012.  Id. at 17.  She argues that Plaintiff's condition did

not worsen after the opinions were formulated as is demonstrated by functional

examinations which do not show a worsening condition.  Id. at 17-18.

Plaintiff is correct that the Tenth Circuit found it troubling when an ALJ relied on

"a patently stale opinion."  Chapo v. Astrue, 682 F.3d 1285, 1292-93 (10th Cir. 2012).

This was so because the relevant medical record in that case "underwent material changes

in the twenty months between" the medical opinion relied upon and the ALJ's decision.

Id., 682 F.3d at 1292.  In Chapo, there were no diagnostic imaging studies and

examination revealed negative straight leg raises and a normal gait when the opinion

relied upon was formulated.  Id.  In the interim, X-rays were taken, examination revealed

positive straight leg raises and a guarded gait, and an MRI was performed which revealed

"bilateral encroachment on the S1 nerve root."  Id.  However, because the ALJ had

moderated the extreme limitations of the opinion relied upon, and properly rejected a

summary RFC assessment opined by a treating physician, and because the court had

already determined remand was necessary in that case it did "not make a definitive

determination on this question," but encouraged "the ALJ to obtain an updated exam or

report to forestall any potential problems from arising . . . on remand."  Id. 682 F.3d at

1293.

This case is to be distinguished from Chapo.  Here, there were diagnostic imaging studies available when Dr. Dobyns and Dr. Klinger formulated their opinions even though there were additional studies performed after their opinions were formulated.  Perhaps most importantly in this case there was not a material change in the record or in Plaintiff's condition after Dr. Dobyns and Dr. Klinger formulated their opinions.  Although Plaintiff makes much of differences in language between the imaging reports done before the opinions at issue were formulated and the imaging reports done thereafter, she does not demonstrate that her condition worsened.

The court notes that every time the ALJ discussed a diagnostic imaging report regarding Plaintiff's low back, he referred to the procedure as an "MRI."  (R. 22, 24-27).  Nowhere in his decision did he mention X-rays.  However, in the medical records it does not always identify the procedure performed specifically.  For example, the ALJ cites to an "MRI" performed in September, 2011.  (R. 25) (citing Ex. 6F/26 (R. 421)).  The evidence cited is a "Diagnostic Imaging Report," and is not specifically identified internally as an X-ray report or an MRI report.  (R. 421).  However, it speaks of "2-3 views," and notes that there is no "radiopaque foreign object," suggesting it is the interpretive report of X-rays.  Id.  Moreover, it is part of the Emergency Department records from Wesley Medical Center, and is contained within the records of an emergency room visit on September 6, 2011 after Plaintiff slipped at work and landed on her buttocks.  Id. at 418-21.  Those records reveal that X-rays were taken of Plaintiff's lumbar spine, id. at 419, but they say nothing regarding an MRI.

The ALJ also discussed an "MRI" in February 2014. (R. 25) (citing Ex. 26F/10 (R. 509)). Plaintiff refers to this procedure as "a February 24, 2014 study," but does not identify it as an X-ray or an MRI. (Pl. Br. 5, 6). The report of this procedure is titled "L Spine, AP & Lateral," suggesting (based on the court's experience reviewing records in Social Security disability cases) that it is a report of X-rays, but it does not specifically say whether it is a report of an X-ray or of an MRI. (R. 508-09).

Plaintiff does not argue that it was error for the ALJ to fail to resolve the ambiguity regarding these procedures or to apparently misidentify the procedures at issue. Plaintiff argues, however, that the procedures demonstrate that her condition has worsened. The court does not agree. The question is not whether the ALJ was ultimately correct in all of his findings but whether the relevant evidence is such as a reasonable mind might accept as adequate to support the conclusion reached by the ALJ. It is.

The ALJ summarized the relevant procedures as follows. There was an MRI performed on August 11, 2011 showing "Multilevel disc bulging and disc dessication . . . without significant canal or neuroforaminal narrowing. Findings are most prominent at the L4-L5 and L5-S1 levels." (R. 450-51) (Cited by the ALJ at R. 25 as Ex. 7F/30). The diagnostic imaging done on September 6, 2011 revealed, as the ALJ found, "no acute fracture or dislocation within the lumbar spine." (R. 25, 421). The ALJ provided a more detailed summary of the report of an MRI performed on November 30, 2011:

> an MRI in November 2011 revealed mild disc dehydration with mild broad-based central disc bulge at the L2-L3 level and mild flattening of the anterior thecal sac, and no foraminal stenosis, mild disc dehydration with

> mild annular disc bulge at the L3-L4 level with no foraminal stenosis, a
> broad-based disc bulge with moderate focal central component with slight
> foraminal narrowing bilaterally at the L4-L5 level and slight retrolisthesis
> of the L4-L5 vertebra and mild to moderate loss of disc height.

(R. 25) (citing Ex. 17F (R. 510-511)).[2]  The ALJ summarized the February 2014 "MRI"

as revealing "multilevel degenerative disc disease of the lumbar spine."  (R. 25) (citing

Ex. 16F/10 (R. 509)).

The ALJ also discussed and summarized Dr. Braun's treatment of Plaintiff:

> Dr. Edward Braun reported that on physical examinations, other than
> bilateral tenderness of the claimant's low back and tenderness over the facet
> joints in the lower lumbar spine; she was alert, oriented three times,
> pleasant, gait and station were normal, her strength was 5/5 bilaterally in the
> upper and lower extremities; and her sensation was intact to light touch and
> equal bilaterally in the upper and lower extremities (Exhibit 16F [(R. 500-
> 09)]).  A physical examination performed on February 24, 2014, revealed
> the claimant was 5 feet 5 inches tall and weighed 230 pounds, she had
> limited range of motion in her back secondary to pain, a full range of
> motion in the lower extremities, sensation was intact distally, palpable
> pulses, normal reflexes and reactive knees and ankles bilaterally, she had no
> pain with internal/external rotations of the hips, and her straight leg raise
> was negative (Exhibit 20F/70 [(R. 642)]).

(R. 25).

> The claimant treated with Dr. Braun at the University of Kansas Hospital on
> from [sic] July 16, 2013 through May 2, 2014.  Dr. Braun diagnosed the

---

[2]The court notes that the report of the November 30, 2011 MRI was submitted by
Plaintiff's counsel after the disability hearing, and included the "Full Result" of the MRI
from which the ALJ provided this extensive summary.  (R. 511).  At the bottom of that
report there is also a section heading titled "Impression" which usually provides the
radiologist's summary of the report, and is the section from which this ALJ drew his
summary of the August 11, 2011 MRI report.  See e.g. R. 450-51.  However, beyond the
title, this report does not include the portion containing the radiologist's "Impression."
Compare, R. 511 with R. 450-51.

claimant with chronic pain lumbago, lumbosacral spondylosis, other chronic pain, lumbar displaced disk, and lower extremity sciatica. Dr. Braun's treatment included administering lumbar epidural steroid injections and prescribing Hydrocodone on an as needed basis to the claimant. On May 2, 2014, the claimant was seen by both Dr. Braun and Dr. Jackson. The claimant was diagnosed the claimant [sic] with mechanical back pain with 4-level degenerative disc disease. Dr. Braun reported that the claimant met with Dr. Jackson and they discussed with her options for treatment. Dr. Jackson recommended that the claimant continue with conservative measures such as activity modifications, anti-inflammatories, and physical therapy as these are the number one treatment modality for chronic low back pain. Dr. Jackson reported that he would not recommend any type of surgery for the claimant because he believed the claimant would become worst [sic] rather than better following surgery (Exhibits 16F 20F [(R. 500-09, 573-655)]).

(R. 26). The ALJ stated that he gave significant weight to Dr. Dobyns's opinion that Plaintiff could return to light duties without further restrictions because Dr. Dobyns "followed the claimant a few months after her fall and examined claimant on a regular monthly basis during this time period. Dr. Dobyns read an MRI of the claimant's low back and opined that it showed no significant nerve root compression." (R. 27).

As the evidence discussed above reveals, the diagnostic imaging reports available to Dr. Dobyns and Dr. Klinger showed no significant nerve root compression and no significant central canal stenosis. (R. 450-51, 510-11). The evidence relied upon by Plaintiff does not demonstrate significant nerve root compression or significant central canal stenosis thereafter and does not compel a different conclusion than that reached by the ALJ.

First, Plaintiff argues that an August 2, 2013 MRI "revealed moderate disk bulge at L4-L5 with neural foraminal narrowing at that level and at L2-L3 moderate disk bulge

with <u>left paramedian annular tear</u> described as a displaced disk." (Pl. Br. 5) (emphasis in

Pl. Brief) (citing R. 501-02) (citations and parenthetic material omitted). The evidence to

which Plaintiff cites is a treatment note by Dr. Braun in which Dr. Braun refers to an MRI

which was performed on August 2, 2013 and states that it "revealed moderate disk bulge

at L4-L5 with neural foraminal narrowing at that level and at L2-L3 moderate disk bulge

with left paramedian annular tear." (R. 501). It is necessary at this point to remember

that it is Plaintiff's burden to demonstrate that her condition is disabling. While Plaintiff

provides certain of Dr. Braun's comments regarding this MRI, she has not provided the

report of the MRI as read by the radiologist. Therefore neither the court nor the ALJ

could know the degree of narrowing, bulge, tear, or displacement revealed by the MRI.

Dr. Braun noted neural foraminal narrowing at L4-L5 but he did not state the degree of

narrowing revealed. And, the ALJ noted that the November 2011 MRI revealed "slight

foraminal narrowing bilaterally at the L4-L5 level." (R. 25) (citing Ex. 17F (R. 510-

511)). This reveals nothing new and does not demonstrate worsening of Plaintiff's

condition.

  While "L2-L3 moderate disk bulge with left paramedian annular tear" (R. 501) is

certainly different than the "mild disc dehydration with mild broad-based central disc

bulge at the L2-L3 level and mild flattening of the anterior thecal sac" (R. 25) (citing Ex.

17F (R. 510-511)) found in November 2011, there is no record evidence that this

constitutes a material change in the record or a worsening of Plaintiff's condition, and it

does not demonstrate nerve root compression or central canal stenosis, the issues on

which the ALJ's discussion focused.  Moreover, although the ALJ did not discuss the

MRI referred to by Dr. Braun (likely because, as noted above the MRI report itself does

not appear in the record), he specifically noted that Dr. Braun's treatment included

administering lumbar epidural steroid injections and prescribing Hydrocodone on an as

needed basis, and that Dr. Braun agreed with Dr. Jackson's recommendation "that the

claimant continue with conservative measures such as activity modifications, anti-

inflammatories, and physical therapy as these are the number one treatment modality for

chronic low back pain."  (R. 26).  Finally, although Dr. Braun diagnosed Plaintiff with a

lumbar displaced disk (R. 502), he did not describe the left paramedian annular tear as a

displaced disk as Plaintiff suggests.  And, the ALJ specifically recognized Dr. Braun's

diagnosis of a lumbar displaced disk.  (R. 26).

Plaintiff also argues that worsening of her condition is demonstrated by the

February 24, 2014 study which showed "marked degenerative disc disease of L4-L5.

There is moderate degenerative disc disease of L3-L4.  There is mild degenerative disc

disease of L2-L3."  (Pl. Br. 5) (quoting R. 508) (emphasis in Pl. Br.).  And she argues that

the ALJ only mentioned that the February 2014 study "revealed multilevel degenerative

disc disease of the lumbar spine" (R. 25) while ignoring the marked degenerative disc

disease at L4-L5.  Id. at 6.  The court does not agree.

The record does not reveal that the ALJ ignored the finding of marked

degenerative disc disease at L4-L5.  As with most diagnostic imaging reports in the

record, the report of the February 2014 study contains a section titled "Findings" in which

11

the individual findings are reported regarding each level considered, and the findings in this report are as quoted above by Plaintiff.  Compare, (R. 508) with (R. 450) ("Full Results"), (R. 421) ("Findings"), and (R. 511) ("Full Result").  But, again as with most diagnostic imaging reports in the record, the report of the February 2014 study also contains a section titled "Impression" in which an overall impression or summary of the results is contained.  Compare (R. 509) with (R. 450-51, 421), and (R. 511) (containing title heading "Impression," but missing the remainder of that section).  The ALJ stated the February 2014 study's "Impression" when he stated that it "revealed multilevel degenerative disc disease of the lumbar spine."  (R. 509).  The ALJ did not ignore the findings of the February 2014 study.

Moreover, as quoted above the ALJ discussed Dr. Braun's treatment note in which it was noted that Plaintiff was diagnosed with "mechanical back pain with 4-level degenerative disc disease," that Dr. Braun met with Dr. Jackson, and that they would continue with conservative treatment.  (R. 26) (citing Exs. 16F, 20F).  Although not specifically cited by the ALJ, the particular treatment note containing that information appears in the record at page 642.  (R. 642) (Ex. 20F/70).  That note is dated February 24, 2014, the same as Dr. Jackson's February study.  (R. 508, 642).  That note states that "Radiographs" were reviewed, and discusses them as follows:

> AP and lateral of the lumbar spine show normal alignment on AP view. Lateral view shows 2 level degenerative disc disease at L3-4 and L4-5.  No listhesis is noted.  MRI available for review from August 2013 shows degenerative changes throughout the lumbar spine greatest at 3-4 and 4-5,

to a lesser degree 5-1 and 2-3.  No listhesis is noted.  No central or foraminal stenosis is noted at any level.

(R. 642).  The "Radiographs" described in this treatment note include, without doubt, those from the February 2014 study, and describe the degenerative disc disease at L3-4 and L4-5, but do not distinguish the L4-L5 level as "marked" degenerative disc disease.

Plaintiff has shown no error in the ALJ's evaluation of the medical opinions of Dr. Dobyns or Dr. Klinger and has not demonstrated that the record evidence compels a finding of a material change or a worsening in Plaintiff's condition after Dr. Dobyns or Dr. Klinger formulated their opinions.  Therefore, she has not shown that the opinions were stale or that the ALJ did not perform his duty to consider the opinions in light of all of the record evidence.

## III.    The ALJ's Own Medical Opinion

Plaintiff quotes the ALJ's statement:  "The claimant's clinical signs are not strongly positive.  The above residual functional capacity provides work restrictions that address the limitations one would expect her to have" (R.25), and argues that by concluding that the RFC limitations assessed are what one would expect Plaintiff to have, the ALJ improperly rendered a medical judgment regarding Plaintiff's limitations.  (Pl. Br. 7).  Later, she argues that the ALJ's statements that "claimant's treatment visits appear to be primarily for medications refills[,] and treatment was overall routine and conservative" was similarly an imposition of his own judgment.  Id. at 10.  The Commissioner argues that Plaintiff's suggestion is without merit because assessment of

13

RFC is a legal determination, and it is the ALJ's duty to weigh all of the record evidence

and determine Plaintiff's limitations based upon all of the evidence. (Comm'r Br. 18).

The court agrees with the Commissioner.

RFC is an assessment of the most a claimant can do on a regular and continuing

basis despite her limitations. 20 C.F.R. § 404.1545(a); see also, White, 287 F.3d at 906

n.2. It is an administrative assessment, based on all the evidence, of how a claimant's

impairments and related symptoms affect her ability to perform work related activities.

Id.; see also Soc. Sec. Ruling (SSR) 96-5p, West's Soc. Sec. Reporting Serv., Rulings 126

(Supp. 2016) ("The term 'residual functional capacity assessment' describes an

adjudicator's findings about the ability of an individual to perform work-related

activities."); SSR 96-8p, West's Soc. Sec. Reporting Serv., 144 (Supp. 2016) ("RFC is an

administrative assessment of the extent to which an individual's medically determinable

impairment(s) . . . may cause physical or mental limitations or restrictions that may affect

his or her capacity to do work-related physical and mental activities."). The

Commissioner has provided eleven examples of the types of evidence to be considered in

making an RFC assessment, including: medical history, medical signs and laboratory

findings, effects of treatment, reports of daily activities, lay evidence, recorded

observations, medical source statements, effects of symptoms, attempts to work, need for

a structured living environment, and work evaluations. SSR 96-8p, West's Soc. Sec.

Reporting Serv., Rulings 147 (Supp. 2016).

Although an ALJ is not an acceptable medical source qualified to render a medical opinion, "the ALJ, not a physician, is charged with determining a claimant's RFC from the medical record." Howard v. Barnhart, 379 F.3d 945, 949 (10th Cir. 2004). "And the ALJ's RFC assessment is an administrative, rather than a medical determination." McDonald v. Astrue, 492 F. App'x 875, 885 (10th Cir. 2012) (citing Social Security Ruling (SSR) 96-05p, 1996 WL 374183, at *5 (July 1996)). Because RFC assessment is made based on "all of the evidence in the record, not only the medical evidence, [it is] well within the province of the ALJ." Dixon v. Apfel, No. 98-5167, 1999 WL 651389, at **2 (10th Cir. Aug. 26, 1999); 20 C.F.R. § 404.1545(a). Moreover, the final responsibility for determining RFC rests with the Commissioner. 20 C.F.R. §§ 404.1527(e)(2), 404.1546.

Further, Plaintiff's argument misunderstands the ALJ's decision. The conclusion quoted by Plaintiff is included in the ALJ's assessment of RFC. (R. 25). The paragraph for which the quotation is the ALJ's conclusion begins with the statement that Plaintiff's "clinical signs do not support a more restrictive functional capacity." Id. In that paragraph, the ALJ notes the results of several medical examinations contained in the record with essentially normal or mild findings which are not indicative of greater limitations. Id. He concluded that Plaintiff's "clinical signs are not strongly positive," and based upon that fact, that the restrictions assessed in the ALJ's RFC are "the limitations one would expect [Plaintiff] to have." Id. In context, that was an explanation for a part of the ALJ's RFC assessment not a sua sponte rendering of a medical judgment.

15

The other ALJ conclusion which Plaintiff quotes as an example of improperly rendering a medical judgment is to the same effect. In that example, Plaintiff takes the conclusion from another paragraph in the ALJ's RFC assessment and asserts that it is an impropier medical judgment. The ALJ's entire explanation was:

> The claimant's treatment records are also inconsistent with her allegations of total disability, and reflects [sic] negatively on her credibility. The claimant has sought a medical treatment for many complaints, but only conservative treatment such as activity modifications, anti-inflammatories, physical therapy, and epidural injections has been offered in response. No back surgery was offered by the orthopedist surgeon because it was believed that the claimant would become worst [sic] rather than better following surgery. The claimant had 3-4 emergency room visits for her complaints of back pain and none were emergent in nature. The claimant's treatment visits appear to be primarily for medications refills and treatment was overall routine and conservative.

(R. 27). In context, the final sentence which Plaintiff finds improper is merely the ALJ's conclusion, based upon the considerations listed earlier in the paragraph that Plaintiff's treatment was routine and conservative and primarily for medication refills. Plaintiff does not argue that the ALJ erred in the findings upon which he based his conclusion, or that any of Plaintiff's emergency room visits actually required immediate action, but that the conclusion that treatment was routine and conservative and for medication refills was an improper medical judgment. There is no error here.

## IV. Evaluation of Obesity

Plaintiff next claims the ALJ erred in evaluating obesity because he found obesity to be a severe impairment at step two of the sequential evaluation process, and later inconsistently found that no treating physician had found limitations resulting from

Plaintiff's obesity.  She also argues that the ALJ failed to explain why he found no limitations caused by obesity.  The Commissioner argues that the ALJ found at step two that obesity and degenerative disc disease in combination are severe.  (Comm'r Br. 15).  She argues that the ALJ properly considered obesity and all of Plaintiff's other impairments and found that although some were severe and others were not severe, none of them resulted in disability.  Id.

SSR 02-01p, Titles II and XVI: Evaluation of Obesity provides guidance on Social Security Administration (SSA) policy concerning the evaluation of obesity in disability claims, and requires that adjudicators will explain how they reached their conclusion whether obesity caused any physical or mental limitations.  West's Soc. Sec. Reporting Serv., Rulings 257 (Supp. 2016).  At step two of the evaluation process the ALJ found that Plaintiff has impairments of degenerative disc disease of the lumbar spine and obesity which are severe within the meaning of the Act and the regulations, and he explained that those "impairments, in combination, have been determined . . . to cause more than slight abnormalities, and significantly limit the claimant's ability to perform work."  (R. 21).  In his step three evaluation, he found that "the claimant's medically determinable and diagnosed obesity does not impose substantial limitations with mobility and stamina.  Id., at 22 (emphasis added) (citing SSR 02-01p).

In his RFC assessment, the ALJ found that "[t]he objective findings support the claimant's allegations of degenerative disc disease of the lumbar spine and obesity."  Id., at 24.  And, as Plaintiff points out, the ALJ discussed the evidence regarding obesity:

> Throughout the treating notes, the claimant's weight fluctuated between 263 pounds to 240 pounds with BMI [(body mass index)] ranging from 41.00 to 38.8. However, no treating source indicated that the claimant's obesity imposes <u>substantial</u> limitations with mobility and stamina or <u>significantly exacerbate</u> the claimant's other medical conditions.

(R. 27) (emphases added).

Plaintiff's argument misapprehends the step two consideration of "severe" obesity. Plaintiff correctly argues that an impairment is severe at step two if it significantly limits Plaintiff's ability to do basic work activities such as walking, standing, sitting, carrying, understanding simple instructions, responding appropriately to usual work situations, and dealing with changes in a routine work setting. (Pl. Br. 12) (citing 20 C.F.R. § 404.1521). Plaintiff ignores that in the context of step two of the sequential evaluation process, a "significant limitation on the ability to perform basic work activities" is any limitation which has <u>more than a minimal</u> effect on the ability to perform basic work activities. The Tenth Circuit has interpreted the regulations and determined that to establish a "severe" impairment or combination of impairments at step two of the sequential evaluation process, plaintiff must make only a "<u>de minimis</u>" showing. <u>Hinkle v. Apfel</u>, 132 F.3d 1349, 1352 (10th Cir. 1997). Plaintiff need only show that an impairment would have more than a minimal effect on his ability to perform basic work activities. <u>Williams</u>, 844 F.2d at 751.

Therefore, in finding that Plaintiff's degenerative disc disease and obesity in combination are severe, the ALJ found that, in combination, these impairments have <u>more than a minimal effect</u> on Plaintiff's ability to perform basic work activities. This finding

is not inconsistent with the ALJ's finding in discussing RFC assessment that "no treating source indicated that the claimant's obesity imposes <u>substantial</u> limitations with mobility and stamina or <u>significantly exacerbate</u> the claimant's other medical conditions."  (R. 27). The ALJ found that these impairments, in combination, limit Plaintiff to light work; to only frequent (not constant) climbing of stairs and ramps, stooping, kneeling, crawling, and crouching; and to only occasional climbing of ladders, ropes, and scaffolds.  (R. 22). These restrictions represent more than a minimal effect on Plaintiff's abilities to perform basic work activities such as walking, standing, sitting, and carrying even though the ALJ also recognized that "no treating source indicated that the claimant's obesity imposes <u>substantial</u> limitations with mobility and stamina or <u>significantly exacerbate</u> the claimant's other medical conditions."  (R. 27).

Plaintiff's argument that the "ALJ failed to explain his Step 4 conclusions about obesity" (Pl. Br. 13) is clearly belied by the decision quoted above, especially when understood in the context of a proper understanding of the step two and step three evaluations, the ALJ's explanation that he found Plaintiff's impairments severe in combination, and a proper understanding that, consequently. the RFC limitations assessed include consideration of the effects of obesity.   Moreover, even if the court were to assume that the ALJ did not consider the effects of obesity in accordance with SSR 02-01p–as he said he did–Plaintiff has shown no harm resulting from that alleged error because she points to no record evidence demonstrating limitations greater than those

assessed by the ALJ and resulting from the effects of obesity in combination with her other impairments.

## V.    The Credibility Determination

Plaintiff claims error in the ALJ's credibility determination because he did not mention that Plaintiff takes Lortab four times daily (Pl. Br. 14), did not consider the difficulties and limitations Plaintiff reported with her daily activities, id. at 15-16, did not "state in what way [Mr. Lewis's and Plaintiff's mother's] third party Function Reports are inconsistent" with the opinions and observations of qualified medical personnel, id. at 19-20, and did not consider:  that Plaintiff wanted surgery, that Plaintiff had adjustment disorder with mild depression caused by her back pain, and that none of her doctors thought she was exaggerating or malingering.  Id. at 21.  Plaintiff concludes her credibility argument by asserting that "[i]t is not the role of the court to reweigh the evidence to shore up the credibility findings of the ALJ."  Id.

The Commissioner points to the ALJ's credibility discussion in his decision and argues that these findings are sufficient consideration of credibility and are supported by the record evidence.  (Comm'r Br. 19-21).  She argues that the ALJ adequately considered the third-party opinions consistent with the law of the Tenth Circuit.  Id. at 22-23.  She points out that an ALJ need not discuss every piece of evidence, and argues that "the ALJ gave numerous valid reasons to support his subjective symptom assessment," and that those reasons are legally sufficient.  Id. at 24.

The court's review of an ALJ's credibility determination is deferential. It is generally treated as binding on review. Talley v. Sullivan, 908 F.2d 585, 587 (10th Cir. 1990); Broadbent v. Harris, 698 F.2d 407, 413 (10th Cir. 1983). "Credibility determinations are peculiarly the province of the finder of fact" and will not be overturned when supported by substantial evidence. Wilson, 602 F.3d at 1144; accord Hackett, 395 F.3d at 1173.

Therefore, in reviewing the ALJ's credibility determinations, the court will usually defer to the ALJ on matters involving witness credibility. Glass v. Shalala, 43 F.3d 1392, 1395 (10th Cir. 1994); but see Thompson v. Sullivan, 987 F.2d 1482, 1490 (10th Cir. 1993) ("deference is not an absolute rule"). "However, '[f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings.'" Wilson, 602 F.3d at 1144 (quoting Huston v. Bowen, 838 F.2d 1125, 1133 (10th Cir. 1988)); Hackett, 395 F.3d at 1173 (same).

The ALJ in this case provided an extensive and correct explanation of the standard to be applied in evaluating the credibility of a claimant's allegations of symptoms resulting from her impairments. (R. 22-23). He included his credibility determination within his summary of the evidence and explanation of his RFC assessment. Id. at 23-27. He found that Plaintiff's "statements concerning the intensity, persistence, and limiting effects of [her] symptoms are not entirely credible," id. at 24, and organized his reasons for discounting the credibility of Plaintiff's allegations by stating each reason followed by his evaluation of the record evidence relevant to his consideration of that reason. Id. at

24-27. He stated that he discounted the credibility of Plaintiff allegations of symptoms because the objective (medical) findings are not consistent with the severity alleged (R. 24), because the clinical signs do not support a more restrictive RFC, id. at 25, and because the treatment records are inconsistent with Plaintiff's allegations. Id. at 27. He also noted that he considered Plaintiff's medications, her activities of daily living, and the "Third Party Function Reports" completed by Mr. Lewis and by Plaintiff's mother. Id.

Plaintiff does not allege error in any of the reasons given by the ALJ to discount her allegations of symptoms, but rather argues that the ALJ did not give sufficient weight to the additional factors he stated that he had considered, or to "Other Credibility Factors" that he did not specifically mention in the decision. (Pl. Br. 21) But, the law does not require a formalistic factor-by-factor recitation of the evidence. So long as the ALJ sets forth the specific evidence he relies on in evaluating Plaintiff's credibility, the dictates of Kepler v. Chater, 68 F.3d 387, 390-91 (10th Cir. 1995) are satisfied. Qualls v. Apfel, 206 F.3d 1368, 1372 (10th Cir. 2000).

Plaintiff's credibility argument is little more than a request that the court reweigh the evidence in her favor. As noted early in this decision, the court is without jurisdiction to do so. Bowman, 511 F.3d at 1272; Hackett, 395 F.3d at 1172. Plaintiff is correct that the court may not reweigh the evidence to shore up the credibility findings of the ALJ, but it may not do so to Plaintiff's benefit either. Plaintiff must demonstrate the error in the ALJ's rationale or finding; the mere fact that there is evidence which might support a contrary finding will not establish error in the ALJ's determination. "The possibility of

drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence. [The court] may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." Lax, 489 F.3d at 1084 (citations, quotations, and bracket omitted); see also, Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). Here, the ALJ has reached a reasonable credibility determination that is supported by substantial evidence in the record, and the court may not reweigh the evidence and reject that conclusion. Giving the ALJ's credibility determination the deference it is due, the court finds no error.

**IT IS THEREFORE ORDERED** that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the Commissioner's final decision.

Dated this 4th day of May 2017, at Kansas City, Kansas.


s:/ John W. Lungstrum
**John W. Lungstrum**
**United States District Judge**